AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

United States of America
v.
Raymond Andres Zumba

*Defendant(s)*

Case No. 3:25-mj-1083-LLL

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of Jan. 23, 2025 to Feb. 14, 2025 in the county of Duval in the Middle District of Florida, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 201(b)(1) | Bribery of a public official |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

[signature]
*Complainant's signature*

Special Agent Ryan McEnany, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: February 18, 2025

[signature]
*Judge's signature*

City and state: Jacksonville, Florida

Laura Lothman Lambert, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**CRIMINAL COMPLAINT**

I, Ryan McEnany, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I was hired by Homeland Security Investigations (HSI) as a Special Agent in September 2004. As part of my training, I attended a 22-week training academy at the Federal Law Enforcement Training Center in Glynco, GA, which included numerous facets of performing federal criminal investigations.

2. As an HSI agent, I have conducted several investigations involving: (1) the unlawful importation, exportation, manufacture, possession with intent to distribute and distribution of narcotics; (2) the illegal importation of intellectual property rights (IPR) commodities; (3) the laundering of narcotics proceeds and ill-gotten gains, and other financial investigations; (4) conspiracies associated with narcotics-related offenses; (5) the unlawful importation and exportation of firearms and firearm parts; and (6) exportation of Personal Identification Information (PII), other sensitive information, and licensable commodities related to national security investigations. These investigations in various areas of criminal law have involved debriefing defendants, witnesses, and informants; conducting surveillance, including court ordered Title III interceptions (electronic surveillance); executing search warrants; seizing assets; and making arrests for violations of federal criminal offenses. I am currently assigned to the HSI Jacksonville, Florida, National Security Group (NSG), and I am a task force officer (TFO) with the Federal Bureau of

Investigation (FBI) Counterintelligence Task Force (CITF). The primary mission of the HSI Jacksonville NSG is to investigate individuals and groups engaged in the commission of federal crimes in the Middle District of Florida to include, but not limited to, import/export violations, immigration violations, and economic crimes as they relate to national security. I am also a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws.

3. The information contained in this affidavit is based upon my personal knowledge derived from my participation in this investigation, my review of reports on matters related to this investigation, and the review of information and statements made to me by members of the Naval Criminal Investigative Service (NCIS).

4. I make this affidavit in support of an application for the issuance of a criminal complaint for Raymond Andres ZUMBA, hereinafter "ZUMBA," for violations of 18 U.S.C. § 201(b)(1) (bribery of a public official). This affidavit does not include all facts and evidence known to me, but rather contains facts and evidence sufficient to support the issuance of a criminal complaint.

**PROBABLE CAUSE**

5. In January 2025, a Confidential Source (CS-1) met with NCIS Special Agent (SA) Dustin Doughfman at the NCIS Mayport office and provided information about ZUMBA and his suspected involvement with criminal activity. SA Doughfman advised me of the information obtained from CS-1, as set forth below.

6. CS-1 advised that he/she previously served on the USS Carney with ZUMBA for approximately two years and since that time they had irregular contact with one another. According to CS-1, on an unknown date and time in late November 2024, ZUMBA and CS-1 met at a bar in Jacksonville, Florida. During the conversation, CS-1 noticed ZUMBA seemed to have a significant amount of money. CS-1 stated he/she knew ZUMBA was now in the U.S. Navy Reserves, and questioned ZUMBA about his wealth. ZUMBA explained to CS-1 that ZUMBA had recently married a Chinese national. ZUMBA asked CS-1 if he/she would be willing to house Chinese nationals, for which CS-1 would be paid. CS-1 said he/she would consider it, but did not provide an answer.

7. ZUMBA further stated to CS-1 that he would be traveling to Hong Kong soon and would correspond with CS-1 while in HONG KONG. CS-1 advised SA Doughfman that ZUMBA subsequently sent CS-1, via Snapchat,[1] photographs of what CS-1 believed to be Chinese landscapes and buildings.

8. I queried law enforcement indices and positively identified Raymond Andres ZUMBA, with a date of birth ("DOB") in 1997, with a listed address in Staten Island, New York. CS-1 provided SA Doughfman with telephone number 646-918-9358 as a number utilized by ZUMBA, and the Snapchat account

---

[1] Snapchat is a social media application accessible via its website, snapchat.com, or via its mobile application, accessed through the iPhone App Store or Google Play Store. After acquiring a Snapchat account, users can begin creating and sharing "Snaps," which are photos or videos taken using the Snapchat application's camera on an individual's mobile device. Snaps may be shared either directly in a Chat with one or a group of the user's friends, or shared in a "Story." A user can also make voice or video calls via Snapchat.

"human_league21" as an account utilized by ZUMBA. On January 28, 2025, I issued an Immigration Enforcement Subpoena to T-Mobile requesting toll records and subscriber information for telephone number 646-918-9358, from July 27, 2024, to January 27, 2025. Later that same day, T-Mobile provided the requested records, which revealed telephone number 646-918-9358 was assigned to an individual with the last name Zumba, with an address in Glendale, Arizona. The account was initiated on August 26, 2021.

9. I have also searched Department of Homeland Security (DHS) databases and learned that on or about May 15, 2024, ZUMBA petitioned for immigration benefits for an alien relative (Individual-1). Based on the investigation to date, I believe Individual-1 to be ZUMBA's spouse. According to SA Doughman's review of NCIS databases, ZUMBA is currently a Navy Reservist.

10. I also reviewed DHS databases and discovered on December 4, 2024, ZUMBA flew from JFK International Airport in New York, to Hong Kong International Airport. On December 24, 2024, ZUMBA returned from Hong Kong International Airport to JFK International Airport.

11. According to CS-1, after ZUMBA returned from Hong Kong, ZUMBA contacted CS-1 via Snapchat voice call (using account "human_league21") on or about January 23, 2025. During this call, ZUMBA and CS-1 discussed how CS-1's spouse worked in the office at Naval Air Station Jacksonville (hereinafter "NAS Jax") that issues "CAC Cards." ZUMBA asked if CS-1 and his/her spouse could

issue unauthorized real "CAC Cards" for ZUMBA's "in-laws," in exchange for an under-the-table payment.

12. The "Common Access Card," commonly known as a "CAC" or "CAC Card," is a smart card that serves as a standard form of legal identification issued by the United States Department of Defense (DoD). The CAC is the standard legal identification for active-duty uniformed service personnel, selected reserve personnel, DoD civilian employees, and eligible contractor personnel. It allows eligible individuals to access DoD facilities. Other individuals, such as dependent family members or foreign affiliate military personnel, are not eligible to receive CACs, but rather can obtain a different type of legal identification known as the Uniformed Services ID Card ("USID"), which also allow entrance into DoD facilities.[2] During the conversations set forth below, ZUMBA and CS-1 used the terms "cards," "CACs," and "CAC Cards" interchangeably. The investigation has revealed that the "cards" that ZUMBA solicited CS-1 and his/her spouse (hereinafter "CS-2") to create were USIDs. CS-2 currently works as a government contract employee in the Personnel Services Detachment (PSD) at NAS Jax. As part of his/her official duties, CS-2 processes and issues CACs and USIDs for eligible applicants.

13. According to CS-1, ZUMBA further explained he would pay CS-1 approximately $1,500 for each card. CS-1 said he/she would consider it, but did not provide a conclusive answer. At a point during the conversation with ZUMBA, CS-

---

[2] *See* "Next Generation Uniformed Services ID Card," *available at* https://www.cac.mil/Next-Generation-Uniformed-Services-ID-Card/.

1 began to record it and provided the partial recording to SA Doughfman. I listened to the partial recording and, in summary, the recording began with CS-1 discussing the possibility of creating CACs for certain individuals ZUMBA knew. CS-1 advised ZUMBA that it would be nearly impossible for CS-2 to get new CACs for these individuals due to system checks, but they could get older CACs and provide them to ZUMBA. ZUMBA explained he had enrolled these individuals in "NSIPS" (the Navy Standard Integration Personnel System), and that they were prepared to come to Florida to obtain the cards. CS-1 advised ZUMBA that he/she would do some research. CS-1 asked how much ZUMBA would pay, and ZUMBA said $1,500 per card. ZUMBA said he just wanted to make sure the cards went through and reiterated that "the money is there." CS-1 stated that he/she would look into it to ensure that the cards would not be flagged as illegal activity.

14. On or about January 24, 2025, CS-1 placed a phone call to ZUMBA, which CS-1 recorded and provided a copy of the recording to SA Doughfman. I listened to the call and, in summary, the call continued the previous discussion regarding CACs. CS-1 advised ZUMBA that he/she needed to research the situation. CS-1 asked ZUMBA who the cards would be for, and, after hesitating, ZUMBA replied that the cards were for his "wife's parents." CS-1 asked ZUMBA where they were coming from and where ZUMBA's wife was from, and ZUMBA replied they were from China (hereinafter referred to as the "Chinese buyers"). CS-1 referred back to their previous conversation regarding housing Chinese nationals, which ZUMBA acknowledged. ZUMBA then stated that CS-1 and CS-2 would be

paid $2,000 for the cards. CS-1 stated that he/she would look into it, and that he/she was not looking to be charged with a felony.

15. On January 29, 2025, SA Doughfman and I met with CS-1 and placed a consensually monitored phone call to ZUMBA at Snapchat handle "MNSPRL25." An earlier attempt to contact ZUMBA via the previous Snapchat handle, "human_league21," had been unsuccessful. Prior to the call, CS-1 informed me that he/she believed ZUMBA had, for unknown reasons, created a new Snapchat handle ("MNSPRL25"). The entirety of the call was recorded. In summary, ZUMBA stated that his phone had been stolen and he had to create a new Snapchat account. ZUMBA asked for an update regarding the cards, and CS-1 stated he/she could get the CACs but needed some additional information. ZUMBA asked if he (ZUMBA) needed to bring the Chinese buyers to Florida, which CS-1 confirmed. CS-1 asked what the cards would be used for, and ZUMBA said they were for immigration purposes to show that the Chinese buyers were married to servicemembers. ZUMBA initially stated that he had told the Chinese buyers that they could not use the cards to enter military facilities, but when CS-1 asked if the cards needed to be enabled for base access, ZUMBA said he needed to check with them. ZUMBA then said the cards would only have to be active for a few months, and one of the Chinese buyers wanted to use the card to go on base for shopping. CS-1 asked if ZUMBA wanted to obtain cards for other individuals, and ZUMBA stated, "if it works out smoothly, why not." ZUMBA advised the Chinese buyers were in their 40s, and he would consult with them about payment and timing.

16. On or about January 29, 2025, SA Doughfman queried NCIS systems and informed me that he discovered two individuals listed on ZUMBA's NSIPS account: Individual-2 and Individual-3. Both were associated with a particular phone number and address in Brooklyn, New York. That same day, I queried DHS databases and found Individual-3 was a Chinese national who entered the U.S. on January 5, 2024, on a B2 Visa, which expired on July 4, 2024. A U.S. citizen, Individual-4, subsequently petitioned U.S. Customs & Immigration Services for Individual-3 as an Alien Relative. SA Doughfman queried NCIS systems, and informed me Individual-4 was on active duty with the U.S. Navy from 2019-2024. Individual-3 was listed as having been born in 1984. Individual-1, the suspected wife of ZUMBA, was born in 1987.

17. Following a missed call from ZUMBA on January 31, 2025, CS-1 placed a recorded phone call to ZUMBA at Snapchat handle "human_league21." The entire call was recorded. I have reviewed a copy of the recording, and in summary, ZUMBA asked if CS-1 had arrived at a price for creating the cards. ZUMBA said one card had to be active with the ability to access military facilities, but the second one did not, and again requested a price because the Chinese buyers would be bringing cash. CS-1 stated the price would be $2,500 for the active CAC because it could "get everyone in trouble," and $1,000 for the other card. CS-1 reiterated that CS-2 was nervous about creating an unauthorized active CAC, because it could get audited. ZUMBA stated that the Chinese buyers would pay, but they required that the cards worked to get onto base, and they would be upset if the

cards did not work. ZUMBA and CS-1 discussed if CS-2 needed any paperwork to create the cards, and tentatively arranged to do the deal on or about February 6. ZUMBA then asked if CS-1 and CS-2 would be willing to marry Chinese nationals and assist them with getting legal residency. ZUMBA said they could make a total of $70,000 for doing so. ZUMBA implied that this was what he was doing with his wife (Individual-1), stating that he was waiting for his next payment after she received her green card, and that they lived separately and were not intimate.

18. Following a missed call from ZUMBA on February 1, 2025, at approximately 6:35 p.m., CS-1 placed a recorded phone call to ZUMBA at the Snapchat handle "human_league21." The entire call was recorded. I reviewed the recording and, in summary, the discussion continued from the previous call regarding the cards. ZUMBA advised that he would bring the Chinese buyers onto NAS Jax to meet CS-2 and obtain the cards, and that he had previously brought them onto another (unspecified) facility, telling the gate guards they were his family. ZUMBA said it was not clear whether the male Chinese buyer would travel to Florida because he was a "busy ass dude," but he still wanted a card. ZUMBA affirmed that the woman would come with him to Florida, and that the Chinese buyers had agreed to pay $3,500 total for the cards. ZUMBA and CS-1 discussed pushing the deal back to the week of February 10, and ZUMBA said he would check with the Chinese buyers regarding travel and timing. ZUMBA reaffirmed that "the money is there."

19. On February 5, 2025, at approximately 10:26 a.m., SA Doughfman and I met with the CS and placed a consensually monitored phone call to ZUMBA via Snapchat handle "human_league21." The entire call was recorded. I reviewed the recording and, in summary, ZUMBA and CS-1 discussed meeting at the PSD at NAS Jax after regular business hours on February 13, 2025, so that CS-2 could take fingerprints and photographs to produce the cards. CS-1 stated that the cards would not be ready until the next day. CS-1 stated the male Chinese buyer would have to come in person to get a card. After CS-1 asked if some of the money could be paid up front, ZUMBA explained that the female did not object to that, but the male had previously tried to obtain a card and got "screwed over." CS-1 discussed continuing the scheme after this and ZUMBA stated that if this went well, there would be one more person.

20. On February 8, 2025, CS-1 placed a recorded phone call to ZUMBA via Snapchat handle "human_league21." The entire call was recorded. I reviewed the recording and, in summary, CS-1 and ZUMBA finalized details for meeting on February 13 at the CAC office on NAS Jax after business hours. ZUMBA stated that only the female Chinese buyer would come, so "it will just be 25" (*i.e.*, $2,500 for an active card). ZUMBA said he and the Chinese female would take CS-1 and CS-2 out for dinner afterward. ZUMBA stated they would drive down to Florida from New York because "they" did not want to fly, and complained about having to drive down. CS-1 asked how they would pay for the card, and ZUMBA stated "cash . . . no traces bro." ZUMBA stated they could talk about the marriage scheme they

had previously discussed when they were in person. ZUMBA further stated that CS-1 had an advantage because CS-1 is "still in" (referring to CS-1's active duty status). CS-1 further inquired about how much CS-1 and CS-2 would be paid for participating in fraudulent marriages. ZUMBA replied, as he previously stated, they would make $35,000 each. CS-1 asked how much ZUMBA was making, and ZUMBA stated that he was not making anything on the card deal, and CS-1 and CS-2 were getting "everything." ZUMBA stated that unspecified Chinese individuals paid for his personal travel, including a trip to Las Vegas and a potential trip to Miami. ZUMBA stated he was "entitled" to have trips and dinners paid for by the Chinese. CS-1 and ZUMBA discussed the privacy of their conversations.

21. On February 11, 2025, ZUMBA contacted CS-1 via Snapchat. The entire call was recorded, and I have reviewed the recording. In summary, ZUMBA confirmed that he was planning to leave New York with the Chinese buyer(s) on February 12 and arrive in Jacksonville on February 13. ZUMBA confirmed that he believed the cards being purchased would not be CACs, but rather "dependent cards" (*i.e.*, USIDs), and asked if/when the Chinese buyers would have to renew them. CS-1 and ZUMBA discussed meeting at the PSD on NAS Jax at around 6:00 or 7:00 p.m. on February 13, so CS-2 could take fingerprints and pictures to enter into the system. CS-1 advised ZUMBA that CS-2 would pick up the cards the next morning (February 14), and CS-1 would bring them to ZUMBA later that day. ZUMBA stated that the male Chinese buyer now wanted an "active" card that would also allow him to go on base and "shop," but that the male Chinese buyer

wanted to know what else he would have access to on a DoD facility. CS-1 asked if he was referring to medical care or recreational facilities, to which ZUMBA said he was "just relaying the message." CS-1 noted that he/she was aware that China was looking for "information" about the United States, and that if the Chinese buyer was "about that life," they should talk about money. ZUMBA did not answer directly. CS-1 asked ZUMBA to send biographical details in advance regarding the Chinese buyers so that they could be in the PSD after hours for as little time as possible. ZUMBA affirmed he would send it via text message.

22. Shortly thereafter, CS-1 received several text messages from ZUMBA, which I have reviewed. ZUMBA advised the second buyer was coming, and wrote:




The CS subsequently clarified that the buyers wanted "2 dependent IDs that only allow base access?" ZUMBA said he believed that was correct and asked, "still that price right[?]" ZUMBA sent photographs of two individuals to identify them as the Chinese buyers: Individual-5 and Individual-6. I queried DHS databases and discovered Individual-5 is a Chinese-born naturalized U.S. citizen, and Individual-6 is a Chinese national who, as of February 13, 2025, was unlawfully present in the U.S.

23. On February 12, 2025, at approximately 5:43 p.m., CS-1 received additional text messages from ZUMBA, which I have reviewed. ZUMBA stated that Individual-5 had "changed her name is it possible to use another documentation to have her new name in the ID." ZUMBA then sent a picture of Individual-5's certificate of naturalization, dated February 7, 2025, with a different first name. ZUMBA advised that he was "leaving Brooklyn" to drive to Jacksonville at that time.

24. On February 13, 2025, at approximately 8:54 a.m., CS-1 placed a consensually monitored phone call to ZUMBA in my presence. The call was recorded. In summary, CS-1 advised ZUMBA that due to his/her Navy duties, CS-1 could meet ZUMBA and the buyers for lunch on February 14, at which time CS-1 would provide them with the cards. ZUMBA agreed, stating they would meet CS-1 there, and "we'll have everything for you, ok?"

25. On February 13, 2025, at approximately 12:00 p.m., CS-1 received text messages from ZUMBA, which I have reviewed. ZUMBA asked where the lunch meeting the next day would occur, "to pick up the cards and eat good." CS-1 then asked if 7:00 would be a good time to meet at the PSD later that evening, and the following exchange ensued:




26. On February 13, 2025, at approximately 5:50 p.m., CS-1 placed a consensually monitored phone call to ZUMBA in my presence. The call was recorded. In summary, CS-1 asked ZUMBA if he was set to meet at 7 p.m., which ZUMBA acknowledged. CS-1 informed ZUMBA he/she was on base and ready for ZUMBA and the Chinese buyers whenever they were able to meet. ZUMBA replied he would tell the Chinese buyers to hurry up.

27. Prior to the meeting, NCIS agents installed surveillance cameras and audio recording equipment, which allowed for the meeting to be recorded and monitored by agents. CS-1 and CS-2 both had audio recording devices as well.

28. At approximately 6:45 p.m., NCIS SA Matthew Escobar observed a white Lexus SUV bearing New York license plate LDL8588 arrive in the parking lot of the PSD. According to SA Escobar, a female was driving the vehicle. SA Escobar observed ZUMBA, a female later identified as Individual-5, a male later identified as

Individual-6, and a second female, later identified as Individual-7, exit the vehicle. CS-1 and ZUMBA greeted each other, while the other parties introduced themselves including CS-2.

29. While the other individuals went inside the PSD, ZUMBA and CS-1 met in the Lexus SUV in the parking lot. This meeting was audio-recorded in its entirety. According to CS-1 and my review of the recording, ZUMBA stated while showing CS-1 an amount of cash, "This is your insurance. . . . This is 35 ok, so if you want to count it right now, you can count it right now, or if you want to wait 'til tomorrow so you can count it, 'cus they told me to give it to you tomorrow so when we get the cards and then whatever. But this is just to show you [], this is going to be your money tomorrow." After CS-1 asked if the money was for three cards, ZUMBA advised that Individual-7 was only there to translate for the other two, and it was $3,500 for the two cards as previously discussed. ZUMBA advised CS-1 that if this deal was successful, then other individuals would also be interested in obtaining USIDs.

30. According to my observations, review of the recordings, and discussions with other agents and CS-2: CS-2 escorted Individual-5, Individual-6, and Individual-7 into the PSD, while ZUMBA and the CS remained with the Lexus. Upon entry, the lights in the PSD were off, and CS-2 locked the door from the inside. Individual-7 translated at certain times what CS-2 said into Chinese for Individual-5 and Individual-6. CS-2 asked Individual-7 what type of identification card Individual-5 and Individual-6 wanted. Individual-7 stated that they did not want

"CAC cards," but rather the "military service ID card," *i.e.*, USIDs, and that Individual-5 requested a fully operating card. CS-2 then processed Individual-5 and Individual-6 for USIDs, taking photographs and fingerprints. During the processing, CS-2 made several references to their meeting occurring after normal business hours and outside normal practice.

31. At approximately 7:19 p.m., the meeting concluded. NCIS SA Escobar observed ZUMBA and the other three individuals depart in the Lexus SUV.

32. On February 14, 2025, at approximately 10:52 a.m., CS-1 placed a consensually monitored phone call to ZUMBA in my presence. The entire call was recorded. In the call, CS-1 advised ZUMBA there was an issue with the PSD computer that had deleted the photos of Individual-5 and Individual-6, but that CS-2 had been able to use their other identification photos to create the cards. CS-1 advised ZUMBA that if he wanted to do future identification cards "remotely" without driving to Jacksonville, they had found the "cheat code" to do so. ZUMBA expressed his excitement at that prospect, and asked if cards could be mailed to him in the future. ZUMBA confirmed the meeting at 11:30.

33. On February 14, 2025, at approximately 11:30 a.m., I observed CS-1 arrive at the parking lot outside the restaurant where the meeting with ZUMBA and the buyers was to occur. According to my observations and discussions with CS-1 and other agents, ZUMBA came out of the restaurant, greeted CS-1, and got into the white Lexus with CS-1. Inside the vehicle, ZUMBA gave CS-1 $3,500 in cash in exchange for two USIDs bearing Individual-5 and Individual-6's images, which had

been created for the purpose of the operation. CS-1 and ZUMBA then went into the restaurant, and had lunch with Individual-5 and Individual-7. After the lunch, agents with HSI, NCIS, and the Jacksonville Sheriff's Office detained ZUMBA, Individual-5, and Individual-7. On scene, ZUMBA advised agents that Individual-6 had left in the early morning and flown back to New York.

34. ZUMBA was transported to the HSI office in Jacksonville. After being advised of his constitutional rights, ZUMBA agreed to be interviewed. The interview was audio-recorded. During the interview, ZUMBA stated that Individual-5 and Individual-7 had been his friends for approximately a year, and that he had recently met Individual-6 before traveling to Hong Kong in December 2024. ZUMBA initially stated that they had driven down to Jacksonville to meet up with certain friends. After being advised that law enforcement was aware of the trip's true purpose, ZUMBA admitted he had driven to Jacksonville because "they just wanted cards. That's it. They just wanted cards. . . . I told them not to have base access cards, just cards." ZUMBA stated he believed they had only obtained "dead" cards, which did not have access to the base. After being asked about his marriage and if he was receiving compensation to obtain a green card for Individual-1, the interview ended.

**CONCLUSION**

35. Based on the facts and observations contained in this Affidavit, I believe probable cause exists that Raymond Andres ZUMBA committed a violation of 18 U.S.C. § 201(b)(1) (bribery of a public official).

Respectfully submitted,

Ryan McEnany
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me on February 18, 2025, at Jacksonville, Florida.

LAURA LOTHMAN LAMBERT
UNITED STATES MAGISTRATE JUDGE